## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| **FRANCELLY SANCHEZ LONDONO,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **13-11106-FDS** |
| | ) | |
| **NELSON GONZALEZ,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |
| _____ | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**SAYLOR, J.**

This is a petition under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. 11601, and the Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, T.I.A.S. N. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Ref. 10,494 (Mar. 26, 1986) ("the Hague Convention"). Petitioner Francelly Sanchez Londono is the mother of E.G, a minor child. Respondent Nelson Gonzalez is E.G.'s father. Petitioner seeks the return of E.G. from Massachusetts to Colombia.

The Court held a hearing on the petition from October 28 to November 4, 2013. For the reasons set forth below, the Court finds that E.G. was retained in the United States by her father in December 2011; that her habitual residence was the United States at the time of retention; and that her retention was not wrongful under the ICARA and the Hague Convention. Accordingly, her mother's request for a remedy of return will be denied, and any dispute concerning rights of access and custody must be decided under the laws of the United States.

The Court's finding is a very narrow one, in keeping with the language and purposes of the ICARA and the Hague Convention. The Court is not determining whether the mother should be granted custody of E.G., or even whether E.G. should be raised exclusively in the United States. Rather, the Court is concluding in substance that E.G. was not unlawfully removed or

detained to the United States, and that the appropriate authority to decide issues of custody and access is the Massachusetts Family and Probate Court rather than the courts of Colombia.

I.    **Findings of Fact**

   A.    **Francelly Sanchez Londono and Her Entry into the United States**

1.    Francelly Sanchez Londono is a Colombian citizen.  (Ex.2)  She is originally from Manizales, Colombia.  (Tr. I:  40).

2.    Sanchez is a native Spanish speaker, and speaks very little English.  (Tr. II:  56).

3.    Sanchez attended the Autonomous University of College of Manizales.  (Tr. I:  41).

4.    In college, Sanchez met Jorge Andres Agudelo.  (Tr. I:  42).  They did not marry, but they had a daughter, C.A., who was born on September 12, 1998.  (Tr. I:  41).

5.    In 2004, Sanchez decided to move to the United States for professional and financial reasons, and to help support her mother and daughter.  (Tr. I:  43).

6.    Sanchez came to the United States illegally.  (*See* Tr. I:  54).  She paid $7,450 to smugglers to take her across the Mexican border into Texas.  (Tr. I:  44).

7.    At no time between 2004 and 2011 was Sanchez legally present in the United States. (*See* Tr. I:  44, 61-62).

8.    Sanchez crossed into Texas from Mexico at the end of 2004.  (Tr. I:  45).

9.    On entering the United States, she made her way to Marlborough, Massachusetts.  (Tr. I: 46-47).  She took a position at New Horizons, a home for the elderly.  (Tr. I:  47).

   B.    **Marriage of Sanchez and Nelson Gonzalez**

10.    In mid-2005, while working at New Horizons, Sanchez met Nelson Gonzalez.  (Tr. I:  47- 48; Tr. III:  40).

11.    Gonzalez first came to the United States from the Dominican Republic in 1987.  (Tr. III: 38).

12.    Gonzalez became a naturalized United States citizen on April 13, 2000.  (Tr. III:  39; Ex. 100).

13. Gonzalez is a native Spanish speaker, and is also reasonably fluent in English.  (*See* Tr. III: 36).

14. Gonzalez has a seventeen-year-old daughter, K.G., from a previous relationship.  (*See* Tr. II: 48; Tr. III: 43-44).  K.G. lives in Massachusetts.  (Tr. III: 44).

15. On December 30, 2005, Sanchez and Gonzalez were married in Framingham, Massachusetts.  (Tr. I: 48; Tr. III: 39; Ex. 103).

**C.  Birth of E.G.**

16. Sanchez and Gonzalez had a daughter, E.G., born on October 12, 2006.  (Tr. I: 49; Ex. 104).

17. E.G. is a citizen of both the United States and Colombia.  (Tr. I: 63-64, Exs. 1, 104).

18. The family lived together in Framingham until December 7, 2008.  (Tr. I: 48-49, 62).

19. During that time, Sanchez was E.G.'s primary caregiver.  (Tr. I: 24, 50).

**D.  Problems in the Marriage**

20. By their second year of marriage, Sanchez and Gonzalez began having frequent arguments.  (Tr. I: 51-54).

21. The arguments were mainly verbal, although on one occasion in 2007 Gonzalez pushed her in the kitchen of their home.  (Tr. I: 52; Tr. II: 39-40).

22. Sanchez had stopped working when she gave birth to E.G. in 2006.  (Tr. I: 50).  She testified that Gonzalez became upset when she returned to work in 2008.  (Tr. I: 52-53).

23. According to Sanchez, Gonzalez was frequently worried because he was afraid immigration would arrest her.  (Tr. I: 53-54).

24. Sanchez also testified that Gonzalez was controlling and insecure.  (Tr. I: 53-54; Tr. II: 36-37).

**E.  Concerns over Sanchez's Immigration Status**

25. Beginning in 2006, the couple sought advice from several individuals on how to make Sanchez's presence in the United States legal.  (Tr. I: 54-55; Tr. III: 42-43, 55-57).

26.     These individuals included an immigration consultant named Carlos Galvez and an immigration attorney named Kenneth Liebman.  (Tr. I:  54-55; Tr. II:  43-44; Tr. III:  56-57).

27.     To help pay for immigration advice, Sanchez's relatives in Colombia sent Gonzalez two Western Union money transfers totaling $8,045.54.  (Tr. I:  55-56; Exs. 7, 8).

28.     In 2008, Sanchez began working at Eliot Healthcare in Natick, Massachusetts.  (Tr. I:  58-59).

29.     While driving in Natick, she was pulled over by a police officer for a traffic violation.  (Tr. I:  59).  She gave him her Colombian driver's license and her American marriage certificate.  (Tr. I:  60).

30.     The police officer called Gonzalez, who had to come pick up Sanchez.  (Tr. I:  60-61; Tr. III:  58).  The police officer gave Sanchez a citation for $400.  (Tr. I:  61).

31.     Because of this incident, Gonzalez became increasingly concerned about the fact that Sanchez was not legally in the United States, and that she could get arrested and deported.  (Tr. III:  42, 58-59).

**F.      Sanchez's Return to Colombia**

32.     At some point in 2008, Sanchez and Gonzalez agreed that she would move back to Colombia.  (Tr. I:  61-62; Tr. III:  54-55).  Both believed that it would be easier for Sanchez to obtain legal residency in the United States if she returned to Colombia and applied from there.  (Tr. I:  61-62; Tr. III:  54-55).

33.     They also agreed that Sanchez would take E.G. with her to Colombia.  (Tr. III:  54-55; Ex. 108).

34.     At the time, Sanchez and Gonzalez planned that Sanchez and E.G. would move back to the United States when the mother could legally return.  (Tr. I: 61-62; Tr. II:  18, 37-38).

35.     The move was also intended to reunite Sanchez with her older daughter, C.A.  (Tr. III:  54-55).  As of 2008, Sanchez had been separated from C.A. for a four-year period.  (Tr.

4

II:  26-27).

36.     Sanchez and Gonzalez intended for C.A. to come live with them in the United States
        once the immigration issues had been resolved.  (Tr. II:  42; Tr. III:  54-55).

37.     Sanchez and E.G. moved to Colombia on December 7, 2008.  (Tr. I:  62; Ex. 2).  E.G.
        was two years old at the time.  (Tr. I:  62).

    **G.     Residence in Colombia**

38.     Beginning in December 2008, Sanchez, E.G., and C.A. lived together in Manizales,
        Colombia with Sanchez's mother.  (Tr. I:  64-65).

39.     E.G. spoke Spanish, not English, while in Colombia.  (*See* Tr. I:  65; Tr. II:  70-71).

40.     E.G. attended preschool in Colombia.  (Tr. I:  66; Exs. 5, 23).

41.     E.G. also spent time with C.A., her grandmother, other relatives, friends and
        schoolmates, and members of her church.  (Tr. I:  64-65, 69-71; Ex. 24).

42.     After moving to Colombia, Sanchez registered E.G. as a Colombian citizen.  (Tr. I:  63-
        64; Ex. 1).

43.     While Sanchez and E.G. were living in Colombia, Gonzalez and E.G. spoke two or three
        times a day by telephone.  (Tr. I:  75; Tr. III:  6).  They also communicated through
        Skype video conference by computer.  (Tr. I:  75; Tr. III:  6).

44.     Gonzalez visited Colombia on one occasion for five days in 2010.  (Tr. I:  78-79; Tr. III:
        101).

45.     During that time, Gonzalez met Sanchez's family for the first time and the two went on
        vacation together.  (Tr. I:  78-79; Ex. 17).

46.     Other than that one visit, between December 2008 and May 2011 Gonzalez never saw
        E.G. in person.  (Tr. III: 89-90).   During that period, he did not ask that she be sent to see
        him in the United States.  (Tr. III:  90).

    **H.     Gonzalez's Activities in the United States and Sanchez's Immigration
        Petition**

47.     In 2008, Gonzalez started working on petitions to the United States immigration

authorities seeking permission for Sanchez and C.A. to immigrate into the United States. (Tr. I:  79-81; Tr. III:  59-60, 67-68).

48.  Gonzalez filed a petition for Sanchez in January 2009.  (Tr. III:  59-60; Ex. 109).

49.  Gonzalez filed a petition for C.A. in December 2009.  (Ex. 110).

50.  As of December 2008, when Sanchez moved back to Colombia, she and Gonzalez expected that the stay would be relatively short.  (Tr. III:  91-92).  Specifically, they expected that Sanchez and C.A. would be granted admission into the United States in approximately seven to nine months.  (Tr. III:  91-92).

51.  In 2009, Gonzalez met Erin McShane.  (Tr. III:  25).  He began a romantic relationship with her about a year later.  (Tr. III:  25).

52.  On December 30, 2010, C.A.'s petition was granted and she was given an immigrant visa into the United States for one year of permanent residence.  (Tr. I:  80; Tr. III:  68; Ex. 110 at *220).

53.  Sanchez's petition was not granted because she was excluded from the country for ten years for having entered the country illegally.  (Tr. I:  80; Ex. 109 at *138).

54.  Sanchez applied for a waiver of the exclusion so she could enter the country.  (Tr.  I: 80).  On March 24, 2011, the waiver was denied.  (Exs. 14, 109 at *140).

55.  Sanchez appealed the denial of the waiver on April 27, 2011.  (Ex. 14).

56.  On January 10, 2013, Sanchez received a letter from United States Customs and Immigration Services ("USCIS") telling her it would act favorably on her application for waiver of her exclusion from the United States.  (Ex. 14).  No further action appears to have been taken on that application by the United States since that time.

**I.  The Children's Move to the United States**

57.  C.A.'s visa for entry to the United States would expire if she did not enter the country by June 29, 2011.  (Ex. 110 at *220).

58.  Sanchez and Gonzalez decided to send C.A. to the United States to prevent C.A.'s visa

from expiring.  (Tr. I:  81-82; Tr. III:  92).

59.   They agreed that Gonzalez would come to Colombia and take C.A. back with him to the
      United States.  (Tr. I:  81-82).

60.   Sanchez and Gonzalez also agreed that E.G. would return to the United States with
      Gonzalez and C.A.  (Tr. I:  81-82).

61.   Sanchez testified Gonzalez told her that the presence of the two daughters in the United
      States would pressure the American government into granting her appeal of her waiver.
      (Tr. I:  82).

62.   At the time, Sanchez was unaware of Gonzalez's relationship with McShane.  (Tr. III:
      101).

63.   In May 2011, Gonzalez traveled to Colombia.  (Tr. I:  85; Tr. III:  57-58).  On May 28,
      2011, he took E.G. and C.A. with him from Colombia to Massachusetts.  (Tr. I:  85; Tr.
      III:  47-48).

64.   At some point before May 28, 2011, Gonzalez consulted with immigration attorney
      Liliana Mangiafica.  (Tr. I:  82-83; Tr. III:  9-10).

65.   Sanchez testified that Gonzalez told her that Mangiafica estimated Sanchez would be
      granted entry into the United States in three months.  (Tr. I:  82-83).

66.   Gonzalez testified that Mangiafica did not give him an expected time line for the granting
      of Sanchez's petition.  (Tr. III:  10).

67.   Gonzalez further testified that before May 28, 2011, he had several conversations with
      Sanchez where he told her he expected she would return to the United States within six to
      seven months, depending on the timing of the immigration decision.  (Tr. III:  10-13).

68.   After Gonzalez returned to the United States with E.G. and C.A., he told Sanchez it
      might take a few more months for her to get into the country.  (Tr. III:  15).

      **J.      Events of Summer 2011**

69.   E.G. and C.A. lived with Gonzalez in Framingham, Massachusetts, beginning in May

2011.  (Tr. I:  25-26; Tr. III:  48).

70.    Gonzalez was outside the home working most of the day during the summer of 2011.
       (Tr. I:  26-27; Tr. III:  48-51).

71.    During the day, E.G. and C.A. would speak to Sanchez by Skype video conference
       through their home computer.  (Tr. I:  86-87; Tr. III:  48).

72.    Sometimes the children would also be cared for by Ines Rosario and Annabella, friends
       of the family from church.  (Tr. I:  26-27; Tr. II:  50-52; Tr. III:  48).

73.    Gonzalez would care for E.G. and C.A. after he returned home from work at around 4:00
       p.m.  (Tr. I:  87; Tr. III:  49).

74.    K.G., Gonzalez's other daughter, would occasionally spend time with the family.  (Tr.
       III:  50-51).

75.    Gonzalez also introduced the girls to McShane.  (Tr. III:  96, 101).

76.    In approximately July 2011, C.A. discovered Gonzalez's relationship with McShane.
       (Tr. III:  96).

77.    Gonzalez instructed C.A. and E.G. not to tell their mother about McShane.  (Tr. III:  96-
       97).

78.    Gonzalez did not tell Sanchez about McShane during that period.  (Tr. III:  101).

79.    Sanchez began to suspect Gonzalez was in a relationship with another woman in August
       or September 2011.  (Tr. I:  88-89).

80.    Sanchez testified that around that time, Gonzalez also began to cut off contact with her.
       (Tr. I:  89-90).

**K.    C.A.'s Return to Colombia**

81.    In December 2011, Sanchez and Gonzalez had a telephone conversation in which
       Gonzalez told her he was sending C.A. back to Colombia.  (Tr. I:  92-93).

82.    Sanchez demanded that Gonzalez return E.G. as well, and he refused.  (Tr. I:  92-93; Tr.
       II:  47).

8

83. Gonzalez testified he wanted to send C.A. back to Colombia because her father (Jorge Agudelo, who lived in Spain) was pressuring him to do so.  (Tr. I:  42; Tr. III:  71-72).

84. Sanchez testified Gonzalez wanted to send back C.A. because caring for her was not convenient for him.  (Tr. II:  45-46).

85. Before he sent C.A. back to Colombia, Gonzalez had to locate her immigration documents.  (Tr. III:  72-73).

86. In January 2012, he found that C.A.'s green card, as well as E.G.'s passport and social security card, were missing from the location where he stored them.  (Tr. III:  72-73).

87. After confronting C.A., he found that she had taken the documents and put them in her locker at school.  (Tr. III:  72-73).

88. While listening to a telephone conversation between C.A. and Sanchez that was on speaker phone, Gonzalez learned that Sanchez told C.A. to hide the papers.  (Tr. III:  72-74).

89. C.A. returned to Colombia in February 2012.  (Tr. I:  94; Tr. III:  70-71).

90. Sanchez testified she learned more details about Gonzalez's relationship with McShane from C.A. after C.A.'s return to Colombia.  (Tr. I:  94-95).

**L.      Life in America after C.A.'s Departure**

91. In September 2011, E.G. began attending daycare at Metro West Center Care in Framingham.  (Tr. II:  52-53; Tr. III:  98).

92. Sanchez periodically called the daycare center and spoke to E.G.'s teacher about E.G. (Tr. I:  89-90).

93. Sanchez testified that after the telephone call in December 2011, when Gonzalez refused to send E.G. back to Colombia, he cut off all contact with her.  (Tr. I:  92).

94. Sanchez also testified that Gonzalez changed his telephone number and address.  (Tr. I:  92).

95. Gonzalez testified that he did not cut off contact with Sanchez.  (Tr. III:  19; 78-79).

96.     He also testified he changed his telephone number in February 2013 and informed
        Sanchez of that change.  (Tr. III:  87-88).

97.     On April 4, 2012, Gonzalez filed for divorce from Sanchez in the Middlesex Probate and
        Family Court.  (Tr. II:  72; Ex. 115).

98.     Notice of the divorce action was sent to Sanchez in Colombia by registered mail.  (Ex.
        115 at *274).

99.     In May 2012, Gonzalez and E.G. moved from Framingham to Quincy.  (Tr. III:  88-89).
        McShane moved in with them.  (Tr. III:  97-98).

100.    Gonzalez did not inform Sanchez of the move or provide her with his new address.  (Tr.
        II:  13-14; Tr. III:  88-89).

101.    In the fall of 2012, E.G. started kindergarten at the Beechwood Knoll Elementary School
        in Quincy.  (Tr. III:  98; Ex. 114).

102.    Gonzalez told the school E.G.'s mother lived in Colombia, but did not give them
        Sanchez's contact information.  (Tr. III:  99-100).

103.    It appears that Sanchez had no communication with E.G. from December 2011 until
        October 2013.  (*See* Tr. II:  71).

104.    Gonzalez interfered with Sanchez's ability to communicate with her daughter by failing
        to provide Sanchez with appropriate contact information.  (Tr. III:  87-89).

        **M.     Gonzalez's Divorce and Remarriage**

105.    Gonzalez appeared before the Middlesex Family and Probate Court regarding his divorce
        petition.  (Tr. III:  18-19).

106.    Gonzalez did not tell the Family Court that Sanchez had been in contact and did not want
        him to have sole custody of E.G.  (Tr. III:  20-21).

107.    On November 21, 2012, the Family Court granted Gonzalez's petition for divorce,
        granting him sole legal and physical custody of E.G.  (Ex. 115 at *270).

108.    Sanchez did not contest the divorce in court.  (Tr. II:  71-73).  She testified she had no

opportunity to do so.  (Tr. II:  55; 71-73).

109.   Sanchez sent an angry e-mail to Gonzalez concerning the then-pending divorce action on October 9, 2012.  (Ex. 116).

110.   The divorce judgment became final ninety days after its entry.  (Ex. 115 at *270).

111.   At some point after his divorce from Sanchez, Gonzalez married McShane.  (Tr. II:  54-55; Tr. III:  25).

### N.   Sanchez's Petition and Further Immigration Status

112.   Around February 13, 2012, Sanchez approached the Colombian Institute of Family Welfare ("ICBF"), Interpol, and the Colombian police about Gonzalez's refusal to send E.G. back to Colombia.  (Tr. I:  95-96; Ex. 20).

113.   Sanchez also sought assistance from the mayor of Manizales, Colombia, and the media.  (Tr. II:  11-12).

114.   Sanchez filed a formal statement about E.G. with the ICBF on March 7, 2012.  (Tr. I:  98; Ex. 22).

115.   On June 27, 2012, Sanchez filed an official application for return of E.G. to Colombia under the Hague Convention.  (Tr. I:  100-03; Ex. 13).

116.   On January 2, 2013, Gonzalez sent an e-mail to the United States Citizenship and Immigration Services ("USCIS"), asking them to terminate Sanchez's immigrant visa petition.  (Tr. III:  29-30; Ex. 109 at *144).

117.   That e-mail stated Gonzalez was legally divorced from Sanchez and that he no longer supported her request to enter the United States.  (Ex. 109 at *144).

118.   McShane helped Gonzalez write the e-mail.  (Tr. III:  30, 83-84).

119.   Gonzalez never told Sanchez he was terminating the petition.  (Tr. III:  84).

120.   On January 10, 2013, Sanchez received a letter from USCIS telling her that it would act favorably on her application for waiver of her exclusion from the United States.  (Ex. 14).

121.   The letter does not permit Sanchez legal entry into the country.  (Tr. II:  73-74).

122.   Sanchez testified that if she gained legal entry into the United States, she would live here. (Tr. II: 68).

**O.      Sanchez's and C.A.'s Return to the United States**

123.   In December 2012, Sanchez sent C.A. back to the United States to renew her visa. (Tr. II: 62-63).

124.   C.A. currently lives with Maria Ortiz, the sister of Sanchez's sister-in-law. (Tr. II: 64).

125.   Sanchez was granted a special visa to enter the United States to pursue her Hague Convention petition. (Tr. I: 103; Tr. II: 57).

126.   She entered the United States on September 27, 2013. (Tr. I: 103; Tr. II: 57). She is currently staying with Ines Rosario. (Tr. I: 103).

127.   Sanchez informed Gonzalez she was in the country on October 1, 2013, four days after she had arrived. (Tr. II: 57).

128.   Sanchez had three visits with E.G. before the trial of this proceeding began on October 28, 2013. (Tr. I: 32-39, 104-06; Tr. II: 7-11).

**P.      E.G.'s Life in 2013**

129.   E.G. is currently in first grade at Beechwood Knoll Elementary School in Quincy, Massachusetts. (Tr. III: 46, 98; Ex. 112).

130.   E.G. spends time with Gonzalez's other daughter, K.A. (Tr. III: 44-45).

131.   She also spends almost every other weekend and most holidays with McShane's family. (Tr. III: 76-78; Ex. 112).

132.   E.G. and Gonzalez only speak English around McShane. (Tr. III: 26-27).

133.   She now calls McShane "mom," and has done so for some time. (Tr. III: 25).

**II.    Conclusions of Law**

1.    The Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, T.I.A.S. N. 11,670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Ref. 10,494 (Mar. 26, 1986) ("the Hague Convention") seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting state" and "to ensure that rights of custody and of access under the law of one Contracting state are effectively respected in the other Contracting States."  *Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010) (quoting Hague Convention, art. 1).

2.    The United States has implemented the Convention through the International Child Abduction Remedies Act ("ICARA"), 42. U.S.C. § 11601.  *Abbott*, 130 S. Ct. at 1989.

3.    The parties agree that both the United States and Colombia are parties to the Hague Convention.  *See Escaf v. Rodriguez*, 52 Fed. Appx. 207 (4th Cir. 2007) (affirming return of child to Colombia under the Hague Convention).

4.    The Court has jurisdiction over Hague Convention petitions under ICARA.  42 U.S.C. § 11603(a)-(b).

5.    Petitions are to be decided in accordance with the Hague Convention.  42 U.S.C. § 11603(d); *Abbott*, 130 S. Ct. at 1989.

6.    In cases seeking the return of a child, the petitioner has the burden of proving, by a preponderance of the evidence, that the child was wrongfully removed or retained within the meaning of the Hague Convention.  42 U.S.C. § 11603(e)(1)(A).

7.    "If the child has been 'wrongfully removed or retained within the meaning of the Convention,' the child shall be 'promptly returned,' subject to certain exceptions." *Patrick v. Rivera-Lopez*, 708 F.3d 15, 19 (1st Cir. 2013) (quoting 42 U.S.C. 11601(a)(4)).

8.    The Hague Convention only affords the remedy of return for violations of custody rights, defined as "rights relating to the care of the person of the child and, in particular, the

right to determine the child's place of residence."  Hague Convention, art. 5(a).

9.     The Hague Convention also protects parents' rights of access, defined as "the right to take a child for a limited period of time to a place other than the child's habitual residence."  *Id.* art. 5(b).  ICARA defines "rights of access" as "visitation rights."  42 U.S.C. § 11602(7).

## A.     Wrongful Removal or Retention

10.     Removal or retention of a child is wrongful when "it is in breach of rights of custody attributed to a person, an institution, or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  Hague Convention, art. 3.

11.     To show wrongful removal or retention, a petitioner must prove, by a preponderance of the evidence, that (1) there was a removal or retention, (2) the child's habitual residence was Colombia, (3) the petitioner had custody rights over the child at the time, and (4) the petitioner was exercising those rights.  *Id.*; *Nicolson v. Pappalardo*, 605 F.3d 100, 103 (1st Cir. 2010).

### 1.     Removal or Retention

12.     When deciding cases under the Hague Convention, the court must first determine whether there was a removal or retention.  *Toren v. Toren*, 191 F.3d 23, 27 (1st Cir. 1999).

13.     Neither the Hague Convention nor ICARA define "removal" or "retention."  *Id.*

14.     The parties agree there was no wrongful removal of E.G. from Colombia, because Gonzalez had permission to bring her into the United States.  (Tr. I:  81-82).

15.     Whether there was a retention depends on the agreement of the parties.  *See Toren*, 191 F.3d at 28 (finding that there was no retention where the parties had agreed the child

should stay in the United States until a certain date and that date had not yet passed); *see also Karkkainen v. Kovalchuk*, 445 F.3d 280, 290-91 (3d Cir. 2006) (assuming that "a child is not retained under the Convention until a parent unequivocally communicates his or her desire to regain custody.").

16.   Sanchez demanded E.G.'s return from the United States to Colombia in a December 2011 telephone call with Gonzalez.  (Tr. I:  92-93; Tr. II:  47).

17.   Because the parties did not agree on where E.G. should live after that telephone call in December 2011, the Court finds that E.G. was retained at that time.

### 2.   Habitual Residence

18.   Whether there has been a breach of Sanchez's custody rights over E.G. depends on the law of the state where E.G. was a habitual resident immediately before the wrongful retention.  The Court must therefore determine E.G.'s habitual residence.  Hague Convention art. 3; *see also Redmond v. Redmond*, 724 F.3d 729, 742 (7th Cir. 2013) ("If a child has not been moved from its habitual residence . . . relief under the Hague Convention must be denied without further inquiry into whether the petitioning parent's custody rights have been breached or whether the petitioning parent was actually exercising those rights at the relevant time.").

19.   The Courts of Appeals have employed different tests for determining a child's habitual residence, but all have had the common goal of determining where a child's home was at the time of removal or retention.  *Karkkainen*, 445 F.3d at 291; *see also Silverman v. Silverman*, 338 F.3d 886, 897-87 (8th Cir. 2003) (courts look at the time "immediately before the removal or retention" in determining habitual residence) (quoting Hague Convention, art. 3).

### a.   The Parents' Shared Intent and Settled Purpose

20.   According to the First Circuit, "[t]he Hague Convention does not define 'habitual residence,' but the majority of federal circuits to consider it have adopted an approach

that begins with the parents' shared intent or settled purpose regarding their child's residence."  *Nicolson*, 605 F.3d at 103-04, n.2 (collecting cases); *see also Zuker v. Andrews*, 1999 WL 525936, at *1-2 (1st Cir. Apr. 9, 1999).[1]

21.   In a case alleging a wrongful retention, a child's habitual residence is generally determined by asking whether the prior place of residence was effectively abandoned and a new residence established by the shared actions and intent of the parents coupled with the passage of time.  *Walker v. Walker*, 701 F.3d 1110, 1119 (7th Cir. 2012); *see also Larbie v. Larbie*, 690 F.3d 295, 311 (5th Cir. 2012); *Whiting v. Krassner*, 391 F.3d 540, 548 (3d Cir. 2004).

22.   The parties disagree as to whether they had a shared intent or settled purpose about E.G.'s habitual residence before December 2011.

23.   Gonzalez contends that the shared intent and settled purpose of the parties was for E.G. to live in the United States, and that Sanchez was to join them after gaining legal entry.

24.   Sanchez contends that Gonzalez obtained her assent to take E.G. to the United States by deceit, because she was unaware that he was romantically involved with another woman at the time they made the decision.  (Tr. III:  101).

25.   Sanchez further contends that she did not know at the time that Gonzalez's intent was to take E.G. to the United States without regard to whether she was later able to enter the country.  She contends that her intent was to always have E.G. with her, regardless of what country they were in.

26.   "In cases where there is a dispute regarding a child's habitual residence, 'the

---

[1] The circuits are split as to whether this is the proper test for a change in habitual residence.  The Second, Fourth, Seventh, Ninth, and Eleventh Circuits have adopted a two-part test, considering first the parents' shared settled intention, and second the extent of the child's acclimatization to the new country of residence.  *Gitter v. Gitter*, 396 F.3d 124, 131-32 (2d Cir. 2005); *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009); *Koch v. Koch*, 450 F.3d 703 (7th Cir. 2006); *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001); *Ruiz v. Tenorio*, 392 F.3d 1247, 1252-54 (11th Cir. 2004).  The Sixth and Eighth Circuits have concluded that the settled purpose of a child's move must be viewed from the child's perspective.  *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007); *Stern v. Stern*, 639 F.3d 449, 452 (8th Cir. 2011).  The Third Circuit takes into account intent from both the parents' perspective and the child's.  *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995).  Because *Nicolson* explicitly endorsed analysis of the parents' intent, the Court will follow the circuits that utilize that analysis.

representations of the parties cannot be accepted at face value, and courts must determine habitual residence from all available evidence.'"  *Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009) (quoting *Gitter v. Gitter*, 396 F.3d 124, 135 (2d Cir. 2005)).

27.   Based on the record, the Court finds that the shared intent and settled purpose of the parties was for E.G. to live in the United States.  The parents' shared plan was for E.G. to return to the United States and that Sanchez would follow when she could enter legally. (Tr. I:  61-62; Tr. III:  54-55).  There was never a plan for E.G. to remain in Colombia. (Tr. II:  37-38).

28.   Neither party evidenced an intent to abandon the United States as E.G.'s residence. Sanchez continuously attempted to gain entry into the United States by applying for a visa, requesting a waiver of her exclusion, and appealing the denial of that waiver.  (Tr. I: 79-81; Exs. 14, 109).  Sanchez also testified she would move to the United States if she were allowed entry.  (Tr. II:  68).

29.   Gonzalez's behavior in conducting an extramarital affair, and hiding that affair from Sanchez, does not change the fact that both parties believed E.G. should live in the United States.

30.   Sanchez also implicitly argues that E.G.'s place of habitual residence should be defined in terms of where her mother lived.  Under the Hague Convention, the relevant inquiry is the child's habitual residence, not that of the parents.  *See Silverman*, 338 F.3d at 898 ("[T]he text of the Convention points to the child's, not the parents', habitual residence.").

31.   However, at least one circuit has found that conditioning a child's presence on the ability of the mother to be with the child affects the intent inquiry.  *See Mota v. Castillo*, 692 F.3d 108, 115 (2d Cir. 2012) (finding that mother's conditional intention that child would only live in the United States if she could as well dispositive of the determination of habitual residence).

32.    In this case, however, even if the parties had only agreed to a few months of separation between Sanchez and E.G., they believed that separation would end by Sanchez's entry into the United States, not E.G.'s return to Colombia.  (Tr. I:  82-83; Tr. III:  10-13).  There was no condition, agreed or otherwise, that E.G. would return to Colombia if Sanchez could not gain admission into the United States.

33.    E.G.'s stay in Colombia, although long in duration, was not intended by the parents to be indefinite.  The strongest evidence of that conclusion is that E.G. did eventually return to the United States in 2011.  (Tr. I:  85; Tr. III:  47-48).

34.    The Court therefore finds that the shared intent of the parties was for E.G. to live in the United States.

### b.    E.G.'s Acclimatization

35.    Although the inquiry of a child's habitual residents begins with the shared intent or settled purpose of the parents, "tests of habitual residence must be applied to the circumstances of the case."  *Nicolson*, 605 F.3d at 105.

36.    The Courts of Appeals have split on what other factors are key to a finding of habitual residence.  In cases the First Circuit has cited approvingly, the courts have engaged in a two-step process.  *See Nicolson*, 605 F.3d at 104 n.2.  First, they have looked toward the shared intent or settled purpose of the parents.  *E.g., Hofmann v. Sender*, 716 F.3d 282, 291-92 (2d Cir. 2013); *Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007); *Ruiz v. Tenorio*, 392 F.3d 1247, 1252-53 (11th Cir. 2004).  Second, they have looked at the extent of the child's acclimatization in the new country of residence.  *E.g., Hofmann*, 716 F.3d at 291-92; *Papkosmas*, 483 F.3d at 622; *Ruiz*, 392 F.3d at 1253-54.

37.    If "the evidence unequivocally points to the conclusion that the child has acclimatized to the new location," it becomes the child's new habitual residence.  *Guzzo v. Cristofano*, 719 F.3d 100, 108 (2d Cir. 2013) (quoting *Gitter*, 396 F.3d at 134).  However "in the absence of settled parental intent, courts should be slow to infer . . . that an earlier

habitual residence has been abandoned." *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir.

2001).

38.   An acclimatization requires "'an actual change in geography' coupled with the 'passage

of an appreciable period of time, one sufficient for acclimatization by the children to the

new environment.'" *Maxwell* 588 F.3d at 251 (quoting *Papakosmas*, 483 F.3d at 622).

39.   Under that framework, Colombia could have become E.G.'s habitual residence if she

became acclimatized to the country in December 2011.  This would require her to have

"been physically present in the [country] for an amount of time sufficient for

acclimatization and which had a degree of settled purpose from her perspective." *Tsai-Yi*

*Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 272 (3d Cir. 2007).

40.   After more than two years in Colombia, it is clear that E.G. was acclimatized to the

country at the point of her departure in May 2011.  (Tr. I:  64-71; Exs. 5, 18, 23, 24).

41.   The difficulty in this case is that by the retention in December 2011, E.G. had been back

in the United States for almost seven months.  (Tr. I:  92).

42.   By that time, the record shows E.G. was at least somewhat acclimatized to the United

States.  While in the United States, she had spent time with her stepsisters in

Massachusetts, went on trips to the park or swimming pool with Ines Rosario, and been

in daycare for almost four months.  (Tr. I:  26-29, 86-87; Tr. II:  52-53; Tr. III:  48-51,

98).  These activities suggest she was acclimatized to the United States.  *See Feder v.*

*Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (academic activities are highly suggestive

of acclimatization); *Ruiz*, 392 F.3d at 1255 (school attendance, social engagements, and

lessons are evidence of acclimatization); *Holder v. Holder*, 292 F.3d 1009, 1020 (9th Cir.

2004) (participation in excursions in new country evidence of acclimatization).  Although

this was a relatively short period of time in her life, such short periods support

acclimatization when buttressed by the parents' intent.  *See Mozes*, 239 F.3d at 1078

(acclimatization easy to find if in conjunction with parental intent); *Feder*, 63 F.3d at 219

(six-month period sufficient for acclimatization under the circumstances).

43.   It is true that "a parent cannot create a new habitual residence by wrongfully removing and sequestering a child." *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001); *see also Diorinou v. Mezitis*, 237 F.3d 133, 141-42 (2d Cir. 2001); *Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006); *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 379 (8th Cir. 1995).  These cases, however, have all involved situations where one parent used fear, coercion, or violence to force the family to stay in the new country.  *See, e.g.*, *In re Ponath*, 829 F. Supp. 363, 367-68 (D. Utah 1993) (verbal, emotional, and physical abuse); *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1055-56 (E.D. Wash 2001) (verbal and physical abuse).  Sanchez testified that Gonzalez was controlling and insecure, and there was one alleged incident of physical violence.  (Tr. I:  52-54; Tr. II: 36-40).  However, the record does not support the conclusion that Gonzalez so dominated Sanchez through force or coercion that she did not intend E.G. to live in the United States.

44.   Because the Court finds that the parents' settled intent was for E.G. to live in the United States even before any of Gonzalez's alleged wrongdoing, any such wrongdoing does not change the analysis regarding E.G.'s habitual residence.  His actions may have import in a custody case, but have little effect under the Hague Convention.  *See* Hague Convention, art. 16; *Danaipour v. McLarey*, 286 F.3d 1, 18 (1st Cir. 2002) (no jurisdiction under Hague Convention to decide merits of the underlying custody dispute); *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir. 2000) (the same).

45.   The child's return to the United States, coupled with the parents' shared intent for her to live in the country, show that E.G.'s acclimatization to Colombia did not defeat the parents' intent that the United States be her permanent home.

46.   The Court therefore finds that E.G.'s habitual residence at the time of retention was the

United States.[2]

**B.**      **Rights of Access**

47.    The Hague Convention and ICARA also contemplate remedy for violations of a

petitioner's rights of access.  Hague Convention, art. 21 ("An application to make

arrangements for organising [*sic*] or securing the effective exercise of rights of access

may be presented . . . in the same way as an application for the return of a child."); 42

U.S.C. § 11603(e)(1)(B) (setting burden of proof "in the case of an action for

arrangements for organizing or securing the effective exercise of rights of access").

48.    Here, Sanchez did not request relief for violations of her rights of access to E.G.

49.    Even if Sanchez asked for a return remedy for violations of her rights of access, it would

be unavailable under the Hague Convention.  *Whallon*, 230 F.3d at 455 (Hague

Convention "reserves the remedy of return solely for violations of rights of custody.");

*see also Furnes v. Reeves*, 362 F.3d 702, 716 n. 12 (11th Cir. 2004) ("These

considerations do not allow us to order return of a child simply for violations of access

rights, no matter how egregious."); *Altamiranda Vale v. Avila*, 538 F.3d 581, 583 (7th

Cir. 2008) (violation of rights of access "is not deemed wrongful removal"); *Yang*, 499

F.3d at 275 ("a court cannot order the return of a child when access rights are violated").

50.    It is also unclear whether federal courts have jurisdiction over access-rights petitions.

The Fourth Circuit in *Cantor v. Cohan*, 442 F.3d 196 (4th Cir. 2006), found that the

district court did not have jurisdiction over a petition for violations of rights of access

because ICARA only allowed federal courts to decide rights under the Convention, and

the substance of visitation rights were not controlled by the Convention.  442 F.3d at 206.

The Fourth Circuit noted that the petitioner could file a claim for visitation in state court

---

[2] This conclusion is not meant to endorse or otherwise comment on the appropriateness of the Middlesex
Family Court judgment granting Gonzalez sole custody of E.G.  (Ex. 115).  Such custody decisions can be
persuasive to a court deciding a Hague Convention petition but are not controlling.  Hague Convention, art. 17;
*Rigby v. Damant*, 386 F. Supp. 2d 222, 227-28, n.18 (D. Mass. 2007) (holding that a federal district court
considering a Hague Convention claim may set aside a state court custody ruling) (citing *Silverman*, 338 F.3d at 894;
*Holder*, 305 F.3d at 865).  The Court did not rely on the custody order's reasoning in this decision.

under the state's visitation law, or petition the State Department under the Convention. *Id.*

51.   In contrast, the Second Circuit in *Ozaltin v. Ozaltin*, 708 F.3d 355 (2d Cir. 2013), found that the unambiguous language of ICARA created a federal cause of action to enforce access rights.   708 F.3d at 373-74.   The Sixth Circuit, in a case concerning the Alien Tort Claims Act, came to the same conclusion in *Taveras v. Taveraz*, 477 F.3d 767 (6th Cir. 2007), stating "unlike [t]he Hague Convention, the ICARA, 42 U.S.C. § 11603, does provide for judicial remedies for non-custodial parents, namely for rights of access claims (e.g., visitation)."   477 F.3d at 777 n.7.   *Taveras*, however, did not directly confront an access rights claim under ICARA.   *Id.* at 769.

52.   Because E.G.'s habitual residence was the United States, the Court does not decide this issue.

## III.   Conclusions

53.   To obtain a return remedy, Sanchez has the burden of proving E.G. was wrongfully retained by a preponderance of the evidence.   42 U.S.C. § 11603(e)(1)(A).

54.   Because E.G.'s habitual residence was the United States at the time of retention, her retention was not wrongful under the Hague Convention.   *Gitter*, 396 F.3d at 130 (no wrongful retention unless "the child to whom the petition relates is 'habitually resident' in a State signatory to the Convention and has been removed to or retained in *a different State*") (emphasis added); *Miller*, 240 F.3d at 398; *Karkkainen*, 445 F.3d at 291.

55.   Accordingly, Sanchez's request for a remedy of return will be denied.

56.   Because E.G.'s habitual residence was the United States, Sanchez's access rights must be decided under the laws of the United States.   *See Patrick*, 708 F.3d at 19 (determining parents' rights under law of child's country of habitual residence); *Whallon*, 230 F.3d at 454 (the same).

57.   To obtain relief for violations of her rights of access, Sanchez must request relief from

the Massachusetts state courts.

58.     For the foregoing reasons, the petition is DENIED.

**So Ordered.**


                                        /s/ F. Dennis Saylor
                                        F. Dennis Saylor IV
Dated:   November 18, 2013              United States District Judge